rsity of Illinois. Mr. Baker, we'll begin with you. Thank you, Your Honor. May it please the Court, Counsel, my name is John Baker. We are here asking this Court today to reverse a Grand Summary judgment. This is a retaliation claim, and I believe that the only real issue is was there sufficient evidence of causation that a jury could find in favor of Ms. Tanner, okay? And I think that it's sort of important to understand the overall theory of our case as we get there. Ms. Tanner had worked at the University for several years. She was in a position that she was a teacher, and then she had some administrative duties. Her boss was a man named Driss L. Ackrich. There was a change at Mr. L. Ackrich's supervisor level. A man named Jonathan Goldberg-Bell came in, and clearly there was disagreements between Goldberg-Bell and L. Ackrich, and that necessitated a woman named Karen Maransky, who was even higher in the pecking order, getting involved. Ultimately, Goldberg-Bell got L. Ackrich out. Now, the justification offered to get rid of Ms. Tanner is that there was an investigation that was done internally, and that investigation revealed that she had retaliated against certain adjunct faculty members, and that was the basis for their justification for getting rid of her. Now, if that's true, if that is true, that's absolutely grounds to get rid of somebody, but the question is, would a jury have to actually buy that justification? Is that the question, or is it, it goes to sincerity of the reason more than the weighing the merits of the reason, correct? Yeah, I think it's... So when we say the jury buying it, what is the jury buying or not buying? Well, that's a good question, Judge Brennan. Obviously, if an employer makes a bad decision, that's not subject to a jury second-guessing it, but the question is, was the decision motivated by something else? And so we ask, what evidence is there? How could a jury potentially reach that conclusion that they are lying? This is really where the pretext analysis comes in, and this court in several cases has said, look, and not only this court, in the Supreme Court in Hicks made it clear, if a jury disbelieves the justification that is being offered, discrimination, or in this case, retaliation, can be inferred. So Mr. Baker, is that another way of saying, in response to Judge Brennan's question, that your client bears an affirmative burden of pointing to evidence in the summary judgment record that would permit a jury to find that the university's explanation was a lie? Yes. Okay. So where is that evidence? Well, we look at it from this regard. Ultimately, the individual who made the determination was a woman named Karen Moransky. And Moransky, if we go back, she makes the decision based on this recommendation that, oh, she was, Ms. Tanner was involved in retaliation. Well, the retaliation purportedly was reducing the number of hours that these instructors taught. Okay? Now, first of all, Ms. Tanner was in a ministerial function in doing that. She simply carried out the determination. She did what Driss told her, prepare the schedule under these guidelines. That's what she did. So we start with that. But I don't think that's misunderstood at all in the record. But then the question becomes with Moransky. Moransky knew that Tanner had nothing to do with that because Moransky was the one who in December initially directed that the hours be reduced. She wrote an email in December. And so what we have is we have- But hold on. This is the problem I have with your brief. When you say she had nothing to do with it, the argument almost suggests that she's a data entry clerk, that she's rotely without regard to what she's entering. But I don't think that's, that is not my view of the summary judgment record at all. It's not like somebody just typing in financial transactions. I think if the point you're making is that Al Ockridge was more responsible for the schedule changes in the spring of, what was it, 2016? Yes. In the spring of, okay. I think that's fair. That's a fair argument. But that does not mean that your client was a data entry clerk. I, you know, Judge Carter, she was not a data entry clerk. But her authority was strictly limited. And I think that we have to go back and we have to look at even further back in the record where we see these meetings that were occurring between Moransky, Goldberg-Bell, and Al Ockridge where they were deciding what was going to be done. In fact, in December, Moransky, December 23rd, Moransky specifically wrote in an email, I would rather see more instructors with fewer hours for spring 2016. And then we can plan to run searches for full-time positions for fall 2016 to cut down on the adjuncts. So the decision-making process was made at a higher level. And what we're getting is Jackie is blamed for making this decision when Moransky, who was involved in all of these discussions, knows her involvement was next to nothing. Again, you know, did she have some role? Sure. Your point is well taken. She's not just simply typing in numbers on a screen. But again, it's a very limited role. Her boss told her, I want you to prepare the schedule under these terms. And so she prepares the schedule. The bigger issue is, if you take Moransky out of it, and we were just relying on an unfair investigation, the argument would be Moransky didn't know that. But Moransky knew very clearly what was going on here. She was the one who wrote the emails originally. She is the one who met with Driss. She is the one who met with Jonathan Goldberg-Bell to tell them, look, you know, this is what we need to do. So this was a dispute between Goldberg-Bell and L. Akerich that Moransky was trying to steer in one way. Those meetings occurred without Tanner being present. When Moransky makes the decision that ultimately has the decision-making authority that she is going to terminate or not renew the contract of Tanner, she knows that it's not true, that her involvement is very, very limited at best. And so looking at that, looking at that, a jury could infer that the decision-making process here is based upon a statement that's not true. And when it's based on something that's not true, a jury could possibly... What's the part that's not true? Their statement is she was terminated because she retaliated against these adjuncts. Moransky, when she reads the memo saying she retaliated, knew that that wasn't accurate because she knew of the role that each of those people played in that decision-making process. So Moransky's knowledge base is inaccurate. That's the problem that we have, Judge Scudder. I do see I'm getting close to my rebuttal time, certainly for answering questions that you have, but if not, I'll reserve the balance of my time. Very good. Thank you, Mr. Baker. Thank you. Ms. Barron, we'll move now to you. Good morning. May it please the Court and Barron, counsel, on behalf of the University of Illinois Board of Trustees. This case is not about Karen Moransky. It's not about Jonathan Goldberg-Bell. It's not about Drissell Ackridge. It's about Jackie Tanner. And what did Jackie Tanner do? And as we know, she met... There was an investigation of Mr. L. Ackridge. She met with the University Office of Ethics and Compliance with Executive Director Donna McNeely, and they had a discussion about the intensive English program and what it was about and what her involvement was. And what did Ms. Tanner do during that investigation? She admitted that she prepared the schedules for the adjuncts and sent those to L. Ackridge for review. She admitted preparing a schedule for the adjuncts for the spring of 2016. She admitted to not assigning any hours to certain adjunct instructors who had previously raised concerns to Goldberg-Bell and to others about the IEP and about L. Ackridge. Those are admissions she made. Ms. Moransky would not have needed to become involved in that whole process of getting the adjuncts hours for the spring of 2016 if they had been assigned hours. So there was a discussion about what was going on with the scheduling. And this was a question, and it's in the case report and in the memo from that investigation. So you are saying Sue and Rebecca, that was two of the adjuncts, harmed the program by going to Jonathan, Mr. Goldberg-Bell, with attendance and grade information, and Jonathan acting, resulting in you, meaning Ms. Tanner, not scheduling them, meaning the adjuncts, for the spring. This was Ms. Tanner's answer. Yes, that is true. I had to protect the program and protect the Saudi students. If you read that memo, there's also a discussion of Ms. Tanner's need to eliminate the adjuncts. The memo found that Tanner admitted the adjuncts reporting of concerns to Goldberg-Bell was a factor in the attempt not to retain the instructors. See, this is the context around, I mean, I have the memo in my hands. It's document 7733. Correct. And then there's a case report that's number 36. It's at the very end. Yeah, and then there's this 34, which is Ms. Moransky, the kind of ultimate decision-making memo, right? Correct. So the problem or the challenge that I think Mr. Baker has on his hands is that, these schedule changes into the system, oblivious to what they are, who they involve, why they're being made. And we don't have to guess at that. She has said that in the record. She was upset about the suggestions that were made about Mr. Al Ockridge and the handling of the concerns with the Saudi students. That's the broader context by her own admission. And I don't know how we can divorce the 2016 schedule changes that she inputted from her knowledge of why they were being done. I would say that's correct. And counsel talked about it, something being a motivating factor. I would also point out that motivating factor language, that's not the standard anymore. Since the Nassar case and then this case court's decisions, really in City of Greenfield versus, or Mollet versus City of Greenfield that Judge Brennan was on, it's the but-for cause. And Tanner has the burden of proving the but-for cause. Maybe what they're saying is Mr. Driss Al Ockridge is more responsible for the spring 2016 schedule changes. That might be right. It very well could be. I would say correct, but that doesn't change the outcome of what Ms. Tanner did and what she admitted. Not once in that, I believe that meeting was on February 3rd, but in a later meeting with Ms. Moransky and Laura Alexander from the HR department, she again admitted that she was responsible for preparing the schedules and that she had, she did not put the adjuncts on the spring 2016 schedules because of that, because of their going to Jonathan Goldberg Bell. She admitted that not once, but twice. And the university found that those admissions and her actions violated the university's code of ethics, its own code of conduct and were improper. And that was the reason for her non-renewal of her, of that contract on a going forward basis. Is it possible here that Ms. Tanner's role, there's a discrepancy. She might be listed as a certain type of employee. She might've taken on more responsibility than that slot necessarily allowed for. And now as a result of her decisions, either being helpful or not helpful, she's being told to go back into the scope of her role. I'm specifically referencing UIS produced page 80. Ms. Moransky is saying, and ensure that Jackie's role does not include functional supervision of teachers as it has up to this point. I'm trying, we're trying to identify what Ms. Tanner's role here is and did she exceed it? Well, I don't, I don't, I think I would say a small department, everybody does everything to get it done. And whether she was specifically assigned the role of figuring out schedules by somebody other than Elle Ackrich, or that was just the role she took on and did, she did it. So I don't think that makes a difference about whether that was an assigned duty or not. It's the fact that she did it and passed it along. In the interview, I don't know who it was with. It might've been with Alexander. Ms. Tanner said that she, she really doesn't have much authority in the office, but then when they went through what she does in the office and the decisions she made, she then undermined that because she gave a bunch of examples of things that she does do in the office. Right. And I would say she was allowed during that interview with Ms. Alexander to explain the whole program, what she did, what her role was, what Mr. Elle Ackrich's role was. She was allowed to do that and allowed to present whatever evidence after that interview that she thought she needed to present. And she actually sent Ms. Alexander more information afterwards. So our position is that there's no suspicious timing here. She was involved in scheduling and she, she was given the opportunity to explain everything. And if you look at the memos too, the memos actually go through the whole IEP program and who did what, and also compared the old adjuncts, the people who were not, let's say, put on the schedule for 2016 versus the new people that wanted to be hired. And the person who did that found, which was Ms. McNeely, said, there's really no difference between these people. I'm not sure why the old adjuncts weren't on the schedule to start with. So it's our position that Ms. Tanner cannot prove the forecausation that summary judgment was proper and that we ask that the decision be affirmed. If you have no other questions, thank you. Thank you, Ms. Barron. Mr. Baker, we'll go back to you now for rebuttal argument. Very briefly, I want to move on. Judge Cutter, I do disagree with your reading of the record. I think, I think that it's wrong. I think that the document that you are referring to talks about her doing that at the direction of Drissel Ackridge. But I would like to move on to a different... There's no question she said that, but she's not oblivious to what's happening. She's not a data entry clerk. No, but she's not oblivious to it. But she's not the one making those decisions. I mean, she's being directed on what to do. And that's the point. But I want to get to another point about the fact-finding memo or the investigatory summary. When that investigation came out, when it was started, there was an email sent to Drissel Ackridge saying, we want to talk to you about this so that you can give us a legitimate business justification. He was told, no, you're not allowed to talk to offer the business justification. He was told that by Moransky and Goldberg-Bell. You cannot do that. Okay? So he's not even given an opportunity to respond. When she is presented with the final report, she wasn't given an opportunity to fully rebut it. She wasn't even told that that's what it was for, what the meeting was for. And we've outlined that in our brief. And Alexander said, if she's not given an opportunity to rebut that, that was a problem. So she acknowledged that. So, you know, I mean, you look at all of these factors and you add them together, the investigation that did not comply with the way it should have been done, not allowing them to talk, along with Jackie's known limited role in what it was that she was doing. And you say, well, would a jury be forced to find that that justification is truthful? The answer is they would not. They could find retaliation. And for that reason, the case should be reversed and remanded for trial. Thank you very much. Thank you very much, Mr. Baker. Thank you. Thank you, Ms. Barron. The case was taken under revisement.